FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LINCOLN NATIONAL LIFE INSURANCE COMPANY, | : <br> : <br> : |
| Plaintiff, | : <br> : |
| | : Civil Action No. 08-2917 (JAP) |
| v. | : <br> : |
| WALTER R. CALHOUN and BRANDON CHABNER, as Trustee of the Walter Calhoun Family Insurance Trust dated July 24, 2006, | : OPINION <br> : <br> : <br> : |
| Defendants. | : <br> : |

Pisano, District Judge:

Though framed as a dispute between an individual insurer and an individual insured, the instant case offers a glimpse into a larger debate between the insurance industry and investment speculators that has been brewing for the last several years. This suit requires the Court to contemplate stranger-originated life insurance transactions, in which individuals are able to obtain third party financing to purchase a life insurance policy and to fund the premiums owed under that policy, with some understanding or expectation that the policy will be immediately assigned to an individual lacking an insurable interest, following the expiration of the policy's two-year contestability period. Plaintiff Lincoln National Life Insurance Company ("Lincoln National") seeks rescission of a $3 million life insurance policy owned by Defendant Walter Calhoun's family trust[1] that Calhoun purchased using borrowed funds. Lincoln National alleges

---

[1] Defendant Brandon Chabner serves as the Trustee for this trust.

1

that at the time he applied for a life insurance policy, Calhoun intended to sell his policy to "stranger investors" in the secondary life insurance market, and that Calhoun's Lincoln National life insurance policy is therefore void for lack of an insurable interest.  Further, Lincoln National argues that Calhoun made a material misrepresentation in his application by claiming he had not engaged in discussions about the possible sale or assignment of the policy to a secondary market provider.  In lieu of filing an Answer, Defendants move to dismiss the instant Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), contending that neither a future intent to sell a policy, nor third party financing of the policy's premiums, can serve to invalidate an insurance contract for lack of insurable interest.  Further, Defendants advance several arguments that Lincoln National's material misrepresentation claim fails as a matter of law.

For the reasons set forth below, Defendants' motion is denied without prejudice, and the parties are directed to proceed with discovery.

## I.      Background[2]

### A.      The Secondary Life Insurance Market

This case concerns an aspect of a growing cottage industry in the insurance market, known as stranger-owned life insurance policies or "STOLI" plans[3], in which an individual, typically an elderly one, procures life insurance on his own life in order to subsequently assign

---

[2] In addressing Defendants' motion to dismiss, the Court must accept as true the allegations contained in the Complaint.  *See Toys "R" US, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003); *Dayhoff, Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1301 (3d Cir. 1996). Accordingly, the facts recited herein are taken from the Complaint, and exhibits appended thereto, and do not represent this Court's factual findings.

[3] Related are "SPINLIFE" plans, which stands for "speculator initiated life insurance."

the policy to a third party following the lapse of the two-year contestability period. STOLI transactions are the product of the burgeoning "life settlements[4]" market, in which insureds sell unneeded or unaffordable permanent policies to investors. *See* Jensen & Leimberg, *supra*, at 111. STOLI schemes emerged as investor demand for these policies exceeded supply, leading industry speculators to solicit insureds to take out additional policies, even if the insureds had no particular need for supplemental insurance coverage. Often, the insureds are persuaded to engage in these STOLI transactions because their bank accounts have run dry and they are forced to spend increasing amounts of money on medical care. As one court put it, "[o]ften pejoratively termed 'stranger-owned life insurance policies' these policies enable the insured to obtain ready cash by selling his policy to a stranger whose only interest in the insured is his early demise." *Life Prod. Clearing LLC v. Angel*, 530 F. Supp. 2d 646, 648 (S.D.N.Y. 2008).

A typical STOLI transaction is structured as follows. An agent attempts to sell a life insurance policy to an elderly insurable candidate, and offers the candidate up-front cash in exchange for promising a future sale of the policy. The agent informs the candidate that the candidate will be able to obtain the policy at virtually no cost to himself, because the agent has secured non-recourse financing to purchase the policy. The candidate then acts as a "nominal grantor" of a life insurance trust that is used to apply for the policy. "At that time, the agent will tell the insured that, in all probability, the policy will be sold to investors for a price that will pay the loan and accrued interest, leaving a profit to split between the agent and the insured. ... If the

---

[4]   A "life settlement" "refers to the sale of an insurance contract to a buyer other than the issuing insurer before the death of the insured." *See* J. Alan Jensen & Stephan R. Leimberg, *Stranger-Owned Life Insurance: A Point/Counterpoint Discussion*, 33 ACTEC J. 110 (2007).

3

insured survives [the two-year contestability period on the policy], the owner (the life insurance trustee) typically has two options, in addition to the sale of the policies to investors: (1) have the insured pay the outstanding debt with accrued interest and retain the policy; or (2) transfer the policy to the lender in lieu of foreclosure." Jensen & Leimberg, *supra*, at 111. The insureds are usually able to garner significantly greater sums from the speculators than they would receive by surrendering the policy to the insurance company. *See* Liam Pleven & Rachel Emma Silverman, *Cashing In: An Insurance Man Builds A Lively Business In Death – As Life Settlements Boom, Banks, Regulators Circle*, Wall St. J., Nov. 27, 2007, at A1.

As the New York Times reported several years ago, "[t]rading in life insurance policies held by wealthy seniors has quietly become a big business. Hedge funds, financial institutions ..., and investors ... are spending billions to buy life insurance policies from the elderly. Other investors are paying seniors to apply for life insurance, lending the money to buy the policies, and then reselling them to speculators." Charles Duhigg, *Late in Life, Finding a Bonanza in Life Insurance*, N.Y. Times, December 17, 2006, at 1. The secondary market has grown from $200 million in transferred death benefits in 1998 to $12 million less than a decade later in 2005. Jensen & Leimberg, *supra*, at 111. One study suggested that as many as 89% of life insurance policies did not pay out death benefits. *Id.* at 112.

Though both sides to this controversy agree that consumers should be permitted to sell unnecessary policies on a secondary market, some have suggested that the increasing popularity of STOLI transactions, as well as the controversy engendered by them, frustrates the legitimacy of the secondary life settlements market. *See id.* at 123 ("The life settlement community is staggering under poor publicity ... and is in great need of distinguishing itself from rogue actors

and actions such as [STOLI transactions]."). Life insurance was typically understood as a means of providing for dependents after the insured has passed on. As some insurance industry advocates have stated, "life insurance is a way for individuals to protect their families . . . If someone profits from a stranger's death, it stands the whole purpose of life insurance on its head." Duhigg, *supra*, at 1. The insurance industry has further argued that such transactions will inevitably raise the cost of life insurance because insurance companies "count on many customers canceling their policies before they die, usually because their children grow up and no longer need the financial protection, their pensions kick in or premiums become too expensive." *Id.*

    **B.**    **The Policy**

At some time before July 24, 2006, Joshua Weinberger, an individual "in the insurance business" (Pl.'s Br., Ex. 1 at 1), approached 75-year old Calhoun, a New Jersey resident, to solicit Calhoun's participation in a premium finance life insurance transaction, whereby Calhoun would "apply for a life insurance policy and sell it for a profit without any cost whatsoever to [] Calhoun." (Compl. ¶ 17.) Weinberger then introduced Calhoun to Gabriel Giordano,[5] a licensed Lincoln National agent in California, in order to prepare an application for a life insurance policy covering Calhoun. Mr. Giordano introduced Calhoun to Defendant Chabner, a California resident, and on July 24, 2006, Calhoun established the Walter Calhoun Family Insurance Trust ("the Trust") with Chabner as the designated trustee. An application seeking a $3 million in life insurance policy for Calhoun's life, with the Trust as the proposed owner and beneficiary, was

---

[5] The Complaint and motion papers do not describe the precise circumstances of how the players came together.

submitted to Lincoln National two days later, on July 26, 2008 ("the Application"). In response to Question 4a on the Application, which asked whether the applicant had engaged in any discussions regarding possible sale or assignment of the policy to "a life settlement, viatical or other secondary market provider" ("the Question"), Calhoun or Chabner answered "no." (Compl., Ex. A.) Both Defendants Calhoun and Chabner signed the Application and certified that all answers to the Application's questions were "complete and true to the best of [their] knowledge." (*Id*.) Lincoln National issued a life insurance policy ("the Policy") insuring Calhoun's life, with the Trust as the Policy owner and beneficiary of the $3 million death benefit, on August 11, 2006. (Compl., Ex. B.)

Sometime thereafter, Lincoln National came to believe that Calhoun intended to sell or assign the Policy to stranger investors. Consequently, on June 12, 2008, Lincoln National filed the instant two-count Complaint against Calhoun and Chabner, seeking declaratory judgment that (1) the Policy is void *ab initio* due to Defendants' material misrepresentations on the Application or, alternatively, the material misrepresentations warrant rescission of the Policy; and (2) the Policy is void due to the absence of an insurable interest. In lieu of filing an Answer, Defendants moved to dismiss the Complaint on July 29, 2008.

## II. Discussion

### A. Standard of Review Under Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a court may grant a motion to dismiss if the complaint fails to state a claim upon which relief can be granted. Recently, the Supreme Court refashioned the standard for addressing a motion to dismiss under Rule 12(b)(6). *See Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1969 (2007). The *Twombly* Court stated that, "[w]hile a

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Id.* at 1964-65 (internal citations and quotations omitted); *see also Baraka v. McGreevey,* 481 F.3d 187, 195 (3d Cir. 2007) (stating that standard of review for motion to dismiss does not require courts to accept as true "unsupported conclusions and unwarranted inferences" or "legal conclusion[s] couched as factual allegation[s]" (internal quotation marks omitted)).  Therefore, for a complaint to withstand a motion to dismiss under Rule 12(b)(6), the "[f]actual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)..." *Twombly*, 127 S. Ct. at 1965 (internal citations and footnote omitted).  However, the Third Circuit has warned that particular caution be used in summarily dismissing cases that hinge on an issue relating to state of mind.  *See Justofin v. Metro. Life Ins. Co.*, 372 F.3d 517, 523-24 (3d Cir. 2004) (observing that "[t]he issue of intent is particularly inappropriate for resolution by summary judgment because evaluating state of mind often requires the drawing of inferences from the conduct of the parties about which reasonable persons might differ.").

    **B.**    **Analysis**

Defendants urge this Court to find that Lincoln National's claim that the policy lacked an insurable interest fails as a matter of law because it is legally permissible for an individual applying for life insurance to have a pre-existing agreement with a stranger lacking an insurable interest in the life if the person applying for insurance, and thus rescission is not permitted on that basis.  Plaintiff argues that Defendants misunderstand the legality of the transaction and what

constitutes an insurable interest. Because the Court finds that Plaintiff has stated a viable claim for rescission based on an absence of an insurable interest, and that Plaintiff has also adequately pleaded a viable claim for material misrepresentation, Defendants' motion is denied.[6]

### 1.   Count I (Material Misrepresentation)

A life insurance policy may be rescinded or voided where an applicant makes a misrepresentation on a policy application that is material. *See* N.J.S.A. § 17B:24-3(d); Cal. Ins. Code § 359. Misrepresentations and omissions are considered "material" if they can be understood to reasonably affect an insurer's decision to enter into the insurance contract, such as misrepresentations or omissions that significantly affect the risk undertaken by the insurer or the amount of premiums to be paid by the insured. *See Ledley v. William Penn Life Ins. Co.*, 138 N.J. 627, 637-38 (1995) (holding that "[a] misrepresentation is material if it 'naturally and reasonably influence[d] the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium.'"(quoting *Mass. Mut. Life Ins. Co. v. Manzo*, 122 N.J. 104, 114 (1991)); Cal. Ins. Code § 334 ("Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages

---

[6]   The Court notes that the parties have raised a choice-of-law issue. However, the Court finds that to make such a finding would be premature and unnecessary since, for purposes of the instant motion, the laws of New Jersey and California are materially the same and further factual development is necessary for the choice-of-law determination. *See Slater v. Skyhawk Transp., Inc.,* 77 F. Supp. 2d 580, 586 (D.N.J. 1999) (noting that first step in choice-of-law analysis requires determining whether there is a conflict between the potentially applicable laws); *Taylor v. JVC Ams. Corp.*, No. 07-4059, 2008 U.S. Dist. LEXIS 43215, *11-12 (D.N.J. May 30, 2006) (in deciding a motion to dismiss, observing that, "assuming that the statutes differ, the second step of the Court's choice-of-law analysis is fact-dependant and, at least in this case, not amenable to decision on a motion to dismiss"). Accordingly, the laws of both New Jersey and California will be referenced in analyzing Lincoln National's two claims.

of the proposed contract, or in making his inquiries.").

The Court finds that Lincoln National has sufficiently alleged facts to defeat a Rule 12(b)(6) challenge.  The Complaint states that although Calhoun represented on the Application that he had not been involved in any discussions regarding a possible sale or assignment of the Policy "to a life settlement, viatical or other secondary market provider" (Compl. ¶¶ 27-28), Calhoun and Chabner "had either contacted or arranged to sell the Policy to a stranger investor" at the time of the Application.  (Compl. ¶ 28.)  Lincoln National further alleges that Calhoun and Chabner never intended to purchase the Policy for Calhoun's benefit or for "any person or entity having an insurable interest in [] Calhoun's life," and that the intention was always that a stranger investor would provide the premium financing, and would be entitled to the death benefit upon Calhoun's death.  (Compl. ¶¶ 29-33.)  Lincoln National also avers that the Trust was created and named as a family trust in order to avoid arousing suspicion that the Policy was part of a STOLI transaction.  (Compl. ¶ 31.)   Finally, Lincoln National concludes that its underwriters relied on the Application in issuing the Policy, and would not have issued the Policy had Calhoun answered the Question truthfully.  (Compl. ¶ 34; Pl.'s Br., Ex. B.)

Defendants argue that Lincoln National's material misrepresentation claim must be dismissed because: (1) Lincoln National would not have been legally entitled to deny Calhoun's application even if he had answered "Yes" to the Question; and (2) a statement of future intent cannot, as a matter of law, form the basis of a material misrepresentation claim.  However, Defendants' arguments are unconvincing.  First, Plaintiff's Complaint states, and a supporting affidavit confirms, that Lincoln National's underwriters would not have issued the Policy had Calhoun answered "yes" to the Question. Defendants are mistaken that insurers may not deny

9

coverage based on "the intended exercise of a legal right" (Defs.' Br. 9); in fact, insurance underwriters are entitled to deny coverage based on any number of *legal* activities that would increase the risk of the contract, such as smoking, cliff-diving, and other activities that may present a risk to continued life.  Defendants' second argument in favor of dismissal rests on a misreading of the Question, which clearly asks whether, at the time he submitted the Application, Calhoun had engaged in any discussions regarding potential sale of the Policy to a stranger investor, and not whether he intended in the future to sell the Policy.  Taking the facts as alleged in a light most favorable to Plaintiff Lincoln National, this Court concludes that dismissal of the material misrepresentation claim would be inappropriate.

### 2. Count II (Lack of an Insurable Interest)

Life insurance polices must be secured by an insurable interest to be valid.  The Supreme Court first elucidated the insurable interest requirement nearly a century ago in the 1911 case, *Grigsby v. Russell,* 222 U.S. 149.  The Court explained that, "[a] contract of insurance upon a life in which the [policy owner] has no interest is a pure wager that gives the [policy owner] a sinister counter interest in having the life come to an end." *Id.* at 154-55.  The requirement that a policy be issued to only those who have an insurable interest, therefore, operates to prevent the prohibited "wagering" contracts.  As one court noted, "[t]he insurable interest requirement developed to curtail use of insurance contracts as wagering contracts by distinguishing between contracts that sought to dampen the risk of actual future loss and those that instead sought to speculate on whether some future contingency would occur.  Without an insurable interest, there would be no actual loss; the contract would thus be a pure gamble." *Sun Life Assurance Co. of Canada v. Paulson*, No. 07-3877, 2008 U.S. Dist. LEXIS 11719, *6-7 n.4 (D. Minn. Feb. 15.

2008) (internal quotations and citations omitted).

Both New Jersey and California law require an insurable interest to exist at the time a life insurance policy is issued. *See* N.J.S.A. § 17B:24-1.1(b); Cal. Ins. Code § 10110.1(e). Statutory definitions of "insurable interest" recognize that an individual has an insurable interest in his own life or the life of a close blood relation, and also where there exists "an expectation of pecuniary advantage through the continued life" of the insured. *See* N.J.S.A. § 17B:24-1.1(a); Cal. Ins. Code. § 10110.1. Additionally, under the law of both jurisdictions, an individual who obtains life insurance on his own life is permitted to transfer ownership of the procured policy to a person or entity that lacks an insurable interest. *See Travelers' Ins. Co. v. Morris*, 115 N.J. Eq. 142 (1934) (recognizing legality of assigning insurance policies to parties without an insurable interest); Cal. Ins. Code §§ 10113.1-10113.2. Insureds begin to run afoul of the insurable interest requirement, however, when they intend at the time of the policy's issuance, to profit by transferring the policy to a stranger with no insurable interest at the expiration of the contestability period.

The parties agree that the Policy has not been transferred to an individual lacking an insurable interest, and remains the property of the Trust. However, Lincoln National alleges that at the time he applied for the policy, Calhoun had already entered into an informal arrangement to assign the policy to a third party who would finance all of is premium payments for the Policy, therefore circumventing the insurable interest requirement. Defendants urge this Court to dispose of the instant Complaint at this early stage of the suit because the Policy has not yet been assigned to a third party, nor is there any guarantee that Defendants will do so. In support of their arguments, Defendants suggest that this Court follow the District of Minnesota's decision in

11

*Sun Life Assurance Co. of Canada v. Paulson*, one of the few district courts to address this issue. In that case, the Court held that the defendant-insured's intent to transfer his policy in a STOLI scheme was "irrelevant" without plaintiff having also identified a prospective third party buyer who lacked an insurable interest in the policy. *See* 2008 U.S. Dist. LEXIS 11719, at *7-8. The Court required plaintiff to plead that there was mutual intent on the part of the defendant-insured *and* the third party to purchase the defendant's policy at the expiration of the contestability period, so as to avoid the prohibition on wagering contracts. Lincoln National, in contrast, argues that dismissal is inappropriate particularly because issues of intent are better decided with the benefit of further factual development. In support of its argument, Plaintiff relies on *Life Prod. Clearing LLC v. Angel*, 530 F. Supp. 2d 646 (S.D.N.Y. 2008), in which the Court held that summary disposition was inappropriate where the plaintiff alleged that the insured had intended at the time of procuring his insurance policy to assign it to a third party with no insurable interest, because plaintiff had successfully alleged a viable claim based on the absence of an insurable interest. *Id.* at 648.

      No Third Circuit or New Jersey Supreme Court decision has confronted the circumstances of the instant case, or determined whether a policy can be voided due to lack of an insurable interest based on the unilateral intent of the insured to sell the policy to a stranger, or whether rescission requires there to have been mutual intent on the part of both the insured and the stranger to assign the policy. Compelling policy considerations are raised by either position. This Court finds that because issues of intent are crucial to this determination, dismissal at this juncture would be premature. The Court notes following the dismissal in the *Paulson* case, the plaintiff's motion to amend its complaint was denied as frivolous because, even after conducting

12

discovery, it was unable to identify a third party with whom the defendant-insured had allegedly agreed to assign the policies at the time the defendant-insured submitted his policy application. *See Sun Life Assurance Co. of Canada v. Paulson*, No. 07-3877, 2008 U.S. Dist. LEXIS 99633 (D. Minn. Dec. 3, 2008). Here, Lincoln National is entitled to proceed and attempt to discover whether, and with whom, Calhoun had arranged to sell the Policy at the time the Application was submitted to Lincoln National. Defendants' motion is accordingly denied.

### III.     Conclusion

For the reasons described above, the Defendants' motion to dismiss pursuant to Rule 12(b)(6) is dismissed without prejudice. An appropriate Order accompanies this Opinion.


Dated: January 27, 2009